# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 13-CR-00202-PWG** |
| | * | |
| **LEONALDO HARRIS and** | * | |
| **JENNIFER SIMS,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |
| | ******* | |

## CONSOLIDATED RESPONSE OF THE UNITED STATES OF AMERICA
## TO DEFENDANT HARRIS'S AND SIMS'S PRETRIAL MOTIONS

The United States of America, by and through its undersigned counsel, hereby respectfully submits the following consolidated response to the pretrial motions filed by defendants Leonaldo Harris and Jennifer Sims. For all the reasons set forth in this consolidated response, the government respectfully requests that this Court deny the pretrial motions.

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

FACTS ............................................................................................................................... 3

ARGUMENT ..................................................................................................................... 9

I.   The Property Was Seized Pursuant To Valid Search Warrants Supported By Probable Cause................................................................................................................................ 9

    A.   The YRC Inspection Was Not An Illegal Government Search. ........................... 10

    B.   The Search Warrants Are Supported By Probable Cause..................................... 11

    C.   Even If The Search Warrants Were Not Supported By Probable Cause, The Good-Faith Exception Applies...................................................................................... 13

II.  The Defendants Are Not Entitled To A *Franks* Hearing. ................................................ 15

    A.      The Affiant Did Not Intentionally Or Recklessly Include Materially False
Statements. ........................................................................................................... 17

    B.      The Affiant Did Not Intentionally Or Recklessly Exclude Material Information. 18

    C.      Even If The Affiant Intentionally Or Recklessly Included Materially False
Statement And Excluded Material Information, Probable Cause Still Remains. . 19

III.    The Defendants' Motions To Suppress Evidence Obtained From Searches Incident To
Arrests (ECF 25, 28). ................................................................................................... 22

IV.    Defendant Sims's Motion To Suppress Statements (ECF 28). ........................................ 23

V.    Sims's Motion To Adopt And Join In Motions Of Codefendants (ECF 27). .................... 26

CONCLUSION ................................................................................................................ 26

## BACKGROUND

On April 24, 2013, an indictment in this case was returned by the grand jury charging Leonaldo Harris, Jennifer Sims and Jermaine McGregor with conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846. Defendants Harris and Sims have filed the following motions:

Defendant Harris

    1.      Motion to Suppress Evidence Secured by Search and Seizure (ECF 25)

    2.      Motion to Suppress and Incorporated Memorandum of Law (ECF 64)

Defendant Sims

    1.      Motion to Adopt and Join in Motions of Codefendants (ECF 27)

    2.      Motion to Suppress (ECF 28)

    3.      Request for 404(b) Disclosure (ECF 29)

    4.      Motion to Adopt Motion to Suppress and Incorporated Memorandum of
Law (ECF 65)

Some of the above-listed motions were filed in early June 2013 by prior defense counsel. *See* ECF 25 (Harris); ECF 27-29 (Sims). The government will nevertheless respond to these motions since they have not been officially withdrawn.[1] Because some of the issues in the above-listed motions have been raised by both of the defendants, the government's consolidated response is organized by the issues raised, rather than by defendant. To the extent that the government's position on any of these motions differs for any of the defendants, the government expressly notes those differences in this consolidated response.

## FACTS

### I.   YRC Inspection of Pallets

YRC Freight ("YRC") is a freight shipping company with a facility located in Carlisle, Pennsylvania. As part of its ordinary course of business, YRC employs inspectors whose responsibilities include comparing freight shipments to weigh bills to identify erroneous commodity descriptions and classifications. The commodity classifications determine, in part, the freight charges collected by YRC. If a YRC inspector believes that the freight shipment does not appear to match the commodity description, the inspector may elect to open the freight shipment to determine its actual contents. If the freight shipment is incorrectly described, YRC may collect freight charges based on the proper classification.

On April 17, 2013, during a routine inspection, a YRC inspector came upon a freight shipment from OC Box Zone, 211 W Katella Avenue, Suite D, Orange, California 92867,

---

[1]     Subsequent to the filing of Sims's Request for 404(b) Disclosure (ECF 29), the government entered into a discovery agreement with Sims's current counsel on June 27, 2013. Because the discovery agreement governs the disclosure of 404(b) evidence, the government will not respond to Sims's previously filed request.

addressed to Auto Tech, 10820 Hannah Street Suite A, Beltsville, Maryland 20705 ("Target Pallet 1").[2]   The YRC inspector observed that the weigh bill for Target Pallet 1 described the contents of the shipment as "rims" while at least one of the boxes on the pallet described the contents as "wheels."   Because rims and wheels have different commodity classifications, the YRC inspector elected to open Target Pallet 1 to determine its actual contents.   The YRC inspector opened one of the boxes on the pallet and found, within a shrink-wrapped plastic tote storage bin, a shrink-wrapped bale.  The YRC inspector opened the bale and found a green-leafy substance suspected to be marijuana.

YRC identified a second pallet as part of the same shipment as Target Pallet 1 ("Target Pallet 2").   The approximate weight of each of the pallets was 1,024 and 924 pounds (collectively, the "Target Pallets").  YRC contacted the Pennsylvania State Police.

## II.    <u>Pennsylvania Search Warrant for Pallets</u>

On April 17, 2013, Trooper Scott Fidler of the Pennsylvania State Police conducted a field test of the green-leafy substance found by the YRC inspector in Target Pallet 1, which returned a positive result for marijuana.   Trooper Jon Mearkle then performed a K-9 scan consisting of four separate runs.  On the first run, comprised of five unrelated pallets, the K-9 did not alert.  On the second run, comprised of Target Pallet 1 and five unrelated pallets, the K-9 alerted on Target Pallet 1.  On the third run, again comprised of five unrelated pallets, the K-9 did not alert.  Finally, on the fourth run, comprised of Target Pallet 2 and five unrelated pallets, the K-9 alerted on Target Pallet 2.

---

[2]       The proper spelling of the street name is "Hanna Street."

On the same day, Trooper Fidler obtained a search warrant from a Magisterial District Judge in Cumberland County, Pennsylvania to search the Target Pallets. *See* Ex. 1 (LH 1953-55). The affidavit in support of the search warrant describes, in relevant part, the YRC inspection, the positive field test and the K-9 alerts. *See id.* Pursuant to the search warrant, members of the Pennsylvania State Police opened boxes on Target Pallet 1. Within these boxes were additional bales of marijuana. Members of the Pennsylvania State Police also pierced through at least one box on Target Pallet 2 and found marijuana within that box. The boxes were repackaged and the pallets re-secured as they had appeared before the search.

## III.    Maryland Search Warrant for Pallets

The Maryland State Police took custody of the Target Pallets. On April 17, 2013, Trooper First Class Steven Sanzaro obtained a search warrant from a judge of the Circuit Court of Maryland for Frederick County to search the Target Pallets. *See* Ex. 2 (LH 001-14). Like the Pennsylvania affidavit, the affidavit in support of the Maryland search warrant describes, in relevant part, the YRC inspection, the positive field test and the K-9 alerts. *See id.* Pursuant to the search warrant, members of the Pennsylvania State Police and Homeland Security Investigations ("HSI") opened some of the boxes on Target Pallet 1. The partial search found approximately 216 pounds of a green-leafy substance suspected to be marijuana. The substance field-tested positive for marijuana. The boxes were then repackaged and the pallets re-secured as they had appeared before the search in order to facilitate a controlled delivery.

## IV.    Controlled Delivery and Search Warrant for 10820 Hanna Street

On April 18, 2013, at approximately 09:00 a.m., HSI Special Agent Evan McKinney observed a burgundy colored Hyundai Sonata bearing Maryland tag 3BA6028 (the "Sonata")

parked in front of 10820 Hanna Street, Suite A, Beltsville, Maryland 20705 ("Hanna Street Warehouse").  At approximately 9:57 a.m., Agent McKinney observed a woman, later identified as Jennifer Sims, exit the Hanna Street Warehouse, lock the door behind her and enter the Sonata.  Sims then drove towards the exit, stopped adjacent to 10850 Hanna Street and made contact with two men operating a white Ford van bearing Texas tag AS01055.  Sims moved from the driver's seat to the passenger's seat of the Sonata and one of the men, later identified as Leonaldo Harris, exited the van and entered the driver's seat of the Sonata.  Harris then drove back to the Hanna Street Warehouse.  Sims exited the Sonata and entered the warehouse.  Harris drove away in the Sonata.

Later the same day, HSI Special Agent James Stull obtained a search warrant from Chief Magistrate Judge William Connelly for United States District Court for the District of Maryland to search the Hanna Street Warehouse.  *See* Ex. 3 (LH 1056-72).  The affidavit in support of the search warrant describes, in relevant part, the YRC inspection, the positive field tests, the K-9 alerts and the partial search of the pallets.  *See id.* ¶¶ 5-7.  The affidavit further states that, based on the training and experience of the affiant and that of other special agents involved in investigating the trafficking of controlled substances, drug traffickers commonly maintain a variety of records and paraphernalia related to the purchase, transportation, sale and distribution of controlled substances.  *See id.* ¶ 9.

At approximately 1:50 p.m., members of HSI, the Maryland State Police Western Maryland Package Interdiction Unit and the Prince George's County Police Department Narcotics Enforcement Division conducted a controlled delivery of the Target Pallets to the Hanna Street Warehouse.  Sims opened the loading bay door for the undercover driver.  She

accepted and signed for the pallets under the name "Jennifer Moreno." While Sims was talking to the undercover driver, she appeared to be on the phone. At approximately the same time, Agent McKinney observed Harris in the Sonata, talking on his phone and watching the undercover driver unload the pallets.

After the pallets were successfully delivered, law enforcement stopped the driver of the white van, later identified as Jermaine J. McGregor, without incident. Following a short high-speed pursuit of the Sonata, law enforcement also apprehended Harris. Sims was taken into custody at the Hanna Street Warehouse.

A search of the Hanna Street Warehouse found various items, including, but not limited to, a scale, 1,356 pounds of marijuana contained in the Target Pallets, used pallets, plywood crates, cardboard boxes, electronic devices and miscellaneous documents.

After he was taken into custody, McGregor was read his Miranda rights, waived those rights and chose to speak to law enforcement. McGregor stated, in relevant part, that he and Harris previously had traveled to Los Angeles, California with approximately $200,000 to purchase marijuana for shipment to Maryland. He further stated that on this particular trip to Los Angeles, they had purchased approximately 1,100 to 1,300 pounds of marijuana and that he was at the Hanna Street Warehouse on April 18, 2013 to assist Harris in transporting the marijuana to another location. McGregor also stated that he had conducted this type of transaction once a month since the beginning of 2013.

## V.   __Search Warrant for 5829 Wyndham Circle__

After she was taken into custody on April 18, 2013, Sims also was read her Miranda rights, signed a waiver of those rights and chose to speak to law enforcement. *See* Ex. 8 (LH

025).    Sims was interviewed by Baltimore City Task Force Officer ("TFO") Joseph A. Dicandeloro and Diplomatic Security Service Special Agent Steve Pruitt.   Sims stated, among other things, that Harris and McGregor had returned from California on April 17, 2013.   Sims also stated that she, her child and Harris stayed at 5829 Wyndham Circle, Unit 105, Columbia, Maryland (the "Wyndham Residence").   Sims requested that she be taken to the Wyndham Residence to retrieve her prescription medication and her child's clothes before being transported to a detention facility.

TFO Dicandeloro and HSI Agents McKinney and Kesha Pitt accompanied Sims to the Wyndham Residence.   Sims granted consent for the officers to enter the premises.   Sims opened the garage door using a garage door opener and entered the garage, along with TFO Dicandeloro and Agent Pitt.   TFO Dicandeloro observed two large boxes in the garage which were consistent with boxes found at 10820 Hanna Street.   TFO Dicandeloro also smelled what he recognized, based on his training and experience, to be an odor consistent with the odor of un-burnt marijuana emanating from the boxes.   As Sims was escorted through the premises to obtain her medication and child's clothes, officers further observed suitcases containing men's clothing, bearing a tag containing the letters "Leona" and bearing a tag for United Airlines Flight 1279 from Los Angeles International Airport to Baltimore Washington International Airport on April 17, 2013.   Sims obtained her medication and child's clothing from the Wyndham Residence and was transported to the Baltimore Central Booking facility.

The next day, on April 19, 2013, Agent Stull obtained a search warrant from Chief Magistrate Judge Connelly to search the Wyndham Residence.   *See* Ex. 4 (LH 1074-92).   The affidavit in support of the search warrant describes, in relevant part, the YRC inspection, the

positive field tests, the K-9 alerts, the partial search of the pallets, the controlled delivery, statements made by McGregor and Sims to law enforcement, the transportation of Sims to the Wyndham Residence and law enforcement's observations at the Wyndham Residence. *See id.* ¶¶ 5-14. Like the affidavit in support of the Hanna Street Warehouse search warrant, the affidavit further states that drug traffickers commonly maintain a variety of records and paraphernalia related to the purchase, transportation, sale and distribution of controlled substances. *See id.* ¶ 15.

Upon execution of the warrant that same day, law enforcement found at the Wyndham Residence various items, including, but not limited to, approximately 38 pounds of marijuana, a loaded Glock 19 firearm, ammunition, firearm magazines, a money counter and financial records.

## VI.   Search Warrants For Storage Unit 1058, Financial Accounts and Electronic Devices

After the controlled delivery, law enforcement obtained additional search warrants. The additional search warrants at issue in defendant Harris's motion to suppress include search warrants for (i) Storage Unit 1058, 14301 Cherry Lane Court, Laurel, Maryland 20707, *see* Ex. 5 (LH 1885-1903); (ii) certain financial accounts, *see* Ex. 6 (LH 1094-1150); and (iii) certain seized electronic devices, *see* Ex. 7 (LH 1663-1724).

## ARGUMENT

## I.   The Property Was Seized Pursuant To Valid Search Warrants Supported By Probable Cause.

Defendant Harris and Sims move to suppress certain seized evidence because the allegedly unconstitutional "initial warrantless search at YRC" tainted the subsequent search warrants. *See* Harris Mot. to Suppress, ECF 64 at 6-7, 11; *see also id.* at 5 ("Pursuant to the

search warrants obtained as the fruit of the earlier warrantless search by [the YRC inspector], law enforcement searched and seized the contents of the pallets as well as other suspected evidence that may be used at trial against Mr. Harris").  For the reasons set forth below, the defendants' motions have no merit.

### A.       The YRC Inspection Was Not An Illegal Government Search.

YRC's initial inspection of the Target Pallets does not implicate the Fourth Amendment and cannot serve as grounds for suppression of evidence later seized by the government pursuant to valid search warrants.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  However, the Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government  or with the participation or knowledge of any governmental official."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (quotation marks omitted); *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003) (holding that the Fourth Amendment "does not provide protection against searches by private individuals acting in a private capacity").  "[E]vidence secured by private searches, even if illegal, need not be excluded from a criminal trial."  *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003).

A search conducted by a private actor implicates the Fourth Amendment only if the private actor was an instrument or agent of the state.  *See United States v. Richardson*, 607 F.3d 357, 364 (4th Cir. 2010).  The Fourth Circuit has considered two primary factors to determine whether a private search raises Fourth Amendment issues: "(1) 'whether the Government knew

of and acquiesced in the private' individual's challenged conduct; and (2) 'whether the private individual intended to assist law enforcement or had some other independent motivation.'" *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010) (quoting *Jarrett*, 338 F.3d at 344).  The defendant bears the burden of proving the agency relationship, "a fact intensive inquiry that is guided by common law agency principles."  *See Richardson*, 607 F.3d at 364 (quoting *Ellyson*, 326 F.3d at 527).

Here, YRC is a private corporation, and the defendants do not allege otherwise.  The defendants have failed to show that YRC, a private entity, was acting as an instrument or agent of the state.  Accordingly, YRC's inspection raises no Fourth Amendment concerns and cannot serve as the basis for suppression of evidence seized by the government pursuant to valid search warrants.  *See Jacobsen*, 466 U.S. at 113 124-26 (upholding private freight carrier's examination of package and federal agent's removal and field test of suspicious substance without a search warrant).

**B.**     **The Search Warrants Are Supported By Probable Cause.**

The defendants argue that absent evidence derived from YRC's "warrantless" inspection, there is no probable cause remaining in the search warrant affidavits to search the Target Pallets, the Hanna Street Warehouse, the Wyndham Residence, Storage Unit 1058, the financial accounts and the electronic devices.  *See* Harris Mot. to Suppress, ECF 64 at 9-11; Sims Mot. to Adopt, ECF 65 at 1 (joining in motion to suppress evidence from Target Pallets, the Hanna Street Warehouse and the Wyndham Residence only).  However, as set forth above, YRC's inspection was a private search that did not implicate the Fourth Amendment.  Accordingly, information regarding YRC's inspection of the pallet and discovery of a green-leafy substance, and the

subsequent positive field-test for marijuana and K-9 alerts, should not be excised from the challenged search warrants. All of the search warrants are valid and supported by probable cause.

A search warrant is valid when it is supported by probable cause to believe that "contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). "The probable cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle,* 540 U.S. 366, 371 (2003). Probable cause exists to search a location when "there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search." *United States v. Suarez,* 906 F.2d 977, 984 (4th Cir. 1990).

When assessing a search warrant application, the magistrate judge is simply tasked with making a "practical, common-sense decision" based on "all the circumstances set forth in the affidavit before him." *Gates,* 462 U.S. at 238. A magistrate judge's "finding of probable cause is subject to great deference on review." *Suarez,* 906 F.2d at 984. "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *see also United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (reviewing court "may ask only whether the magistrate had a substantial basis . . . for concluding that probable cause existed").

The challenged search warrants contain ample probable cause.  The affidavits in support of the Pennsylvania and Maryland search warrants for the Target Pallets include information about the YRC inspection, the positive field tests and the K-9 alerts.  *See* Exs. 1 and 2.  The affidavit in support of the Hanna Warehouse includes the same, plus information regarding the partial search of the pallets by the government pursuant to the earlier search warrants.  *See* Ex. 3.  Similarly, the affidavit in support of the search warrant for the Wyndham Residence includes all of the aforementioned information, in addition to information regarding the controlled delivery, statements made by McGregor and Sims to law enforcement, the transportation of Sims to the Wyndham Residence and law enforcement's observations at the Wyndham Residence.  *See* Ex. 4.  Finally, the affidavits in support of the search warrants for Storage Unit 1058, certain financial account and certain electronic devices include all of the aforementioned information in addition to information about evidence seized at the Wyndham Residence pursuant to a valid search warrant.  *See* Exs. 5, 6 and 7.  In sum, the judges' conclusion that there was probable cause to support the search warrants was fully supported by the affidavits.

**C.      Even If The Search Warrants Were Not Supported By Probable Cause, The Good-Faith Exception Applies.**

In addition to establishing probable cause for the warrants, the above discussion also demonstrates that a reasonable officer in the same shoes as the investigator would not second-guess the determination by a judge that the affidavits were sufficient.  The exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  *United States v. Leon*, 468 U.S. 897, 906 (1984).  The rule is "designed to deter police misconduct, rather than to punish the errors of judges and magistrates."  *Id*. at 916.  The policy behind the rule is not

furthered by excluding evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id*. at 920.  As the policy of the rule is not furthered by excluding evidence secured in good faith, the rule does not bar the admission of evidence obtained from a defective warrant where the executing agents acted in good faith. *Id*. at 920-22.

The good-faith analysis takes the objective perspective – whether a reasonable officer standing in the agent's shoes could be expected to have known that the warrant was invalid. *See United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994).  In "the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.  But an officer's reliance on a judge's probable cause determination is unreasonable where (i) the officer provided knowingly or recklessly false information; (ii) the magistrate wholly abandoned his judicial role; (ii) the affidavit was so deficient in probable cause as to render reliance entirely unreasonable; or (iv) the warrant was so facially deficient as to render reliance unreasonable.  *Id*. at 923.

As discussed above, the law amply supports the judges' conclusions that there was a fair probability that evidence of drug trafficking would be found within the Target Pallets, the Hanna Street Warehouse, the Wyndham Residence, Storage Unit 1058, the financial accounts and the electronic devices.  To be sure, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause . . . ." *Leon*, 468 U.S. at 914.  But even if this Court concludes that probable cause is lacking despite the deference traditionally afforded to the issuing judicial officer, the analysis discussed above more than supports the notion that the affidavits were not so unreasonable as to preclude reliance by the officers.

II.      **The Defendants Are Not Entitled To A *Franks* Hearing.**

In his motion, Harris requests a *Franks* hearing for two reasons with respect to the search warrant for the Wyndham Residence.  *See* Harris Mot. to Suppress, ECF 64 at 11-15.  First, Harris alleges that the affiant, Agent James Stull, intentionally or recklessly included materially false statements in his search warrant affidavit, specifically that Sims requested that she be transported to the Wyndham Residence to retrieve her medication and child's clothing and granted consent to law enforcement to enter the residence.[3]  *See id.* at 12.  Second, Harris argues that the affiant intentionally or recklessly omitted material information essential to the probable cause determination, namely that Agent Pruitt did "not recall smelling marijuana in the garage" and had "manipulated the flap on one of the boxes in the garage."  *Id.*  Despite Harris's contentions, the defendants are not entitled to a *Franks* Hearing.

---

[3]      To the extent that Harris suggests that Sims consented to a *search* of the Wyndham residence, *see* Harris Mot. to Suppress, ECF 64 at 6 ("alleged consent search of his home"); *id.* at 12 ("consent to entry into and the search of Mr. Harris' home"), no such consent to search was given.  Sims granted consent to law enforcement to enter the residence so that she could retrieve her medication and her child's clothing.  Information contained in the affidavits regarding law enforcement's observations at the Wyndham Residence was not pursuant to a search.

Harris appears to argue that statements regarding Sims's request to be transported to the Wyndham Resident and Sims's consent to entry are allegedly materially false and should be excised from the search warrant affidavit, and that statements regarding observations made by officers once in the residence, should also be excised as fruit of the poisonous tree.  *See* Harris Mot. to Suppress, ECF 64 at 14-15.  However, Harris does not allege that the statements regarding the observations by law enforcement – namely, that a law enforcement officer (TFO Dicandeloro) observed two large boxes in the garage which were consistent with boxes found at 10820 Hanna Street, that the same officer smelled what he recognized to be an odor consistent with the odor of un-burnt marijuana emanating from the boxes and the officers observed suitcases containing men's clothing, bearing a tag containing the letters "Leona" and bearing a tag for an April 17, 2013 United Airlines Flight from Los Angeles to Baltimore Washington International Airport – are in themselves false.  The government therefore submits that the statements regarding law enforcement's observations should not be excised under the *Franks* analysis.  But even if those statements were excised, for the reasons set forth in Part II.C, probable cause would still exist.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), and the Fourth Amendment, a defendant is entitled to a pre-trial hearing to challenge the validity of a search warrant affidavit only if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id*. at 155-56. The purpose of a *Franks* hearing is "to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled to believe that there existed probable cause." *United States v. Freidemann*, 210 F.3d 227, 229 (4th Cir. 2000).

A defendant's allegations "must be accompanied by an offer of proof. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171; *see also United States v. Shorter,* 328 F.3d 167, 170 (4th Cir. 2003) (same). Mere conclusory statements about the affiant's intent are insufficient to warrant a hearing; likewise, a request for a hearing simply to have an opportunity to cross-examine the affiant also is insufficient to warrant a hearing. *See United States v. Akinkoye*, 185 F.3d 192, 199 (4th Cir. 1999).

In sum, a hearing is only warranted (i) if the defendant makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or excluded material information in the warrant affidavit, and (ii) the defendant shows that the false information was essential to the probable cause determination or that inclusion of the material omission would defeat probable cause. *See United States v.*

16

*Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990); *United States v. Srivastava*, 411 Fed. App'x 671, 675 (4th Cir. 2011) ("For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause.").

In the instant case, Harris cannot satisfy his burden under either prong, and a *Franks* hearing is not warranted.

### A.    The Affiant Did Not Intentionally Or Recklessly Include Materially False Statements.

Harris alleges, without any support, that Agent Stull included materially false statements in his affidavit that Sims requested that she be transported to the Wyndham Residence to retrieve her medication and child's clothing, and consented to law enforcement's entry into the residence. Harris has offered not a scintilla of proof, let alone made a "substantial preliminary showing," that these statements were false and were included knowingly and intentionally, or with reckless disregard for the truth, in the affidavit.[4]  *Franks*, 438 U.S. at 155-56.  Harris's unsubstantiated allegations of intentional falsehoods are wholly insufficient to warrant a *Franks* hearing.

---

[4]    The issue of whether Sims had a right to grant consent to law enforcement to enter the Wyndham Residence is irrelevant to whether Agent Stull intentionally or recklessly included a false statement in the affidavits.  Moreover, even if it were relevant, the evidence shows that Sims told law enforcement agents at the time of her arrest that she stayed at the Wyndham Residence, Sims had a garage door opener to the residence, she gained access to the residence with her garage door opener, her daily medication was located within the residence and her child's clothing was located within the residence.  Law enforcement agents therefore reasonably believed that they had obtained valid consent.  Furthermore, a later search of the residence pursuant to a search warrant found further indicia of Sims's occupancy, including clothing and documents belonging to her.  As a co-habitant of the Wyndham Residence, Sims had the authority to grant consent to law enforcement agents to enter the property.  *Cf. United States v. Shrader*, 675 F.3d 300, 306 (4th Cir. 2012) (upholding warrantless search where co-habitant gave consent and where defendant previously had objected).

**B.     The Affiant Did Not Intentionally Or Recklessly Exclude Material Information.**

Harris also has failed to make a substantial preliminary showing that the affiant intentionally or recklessly omitted information in his affidavit that Agent Pruitt did "not recall smelling marijuana in the garage" and had "manipulated the flap on one of the boxes in the garage." In *Colkley*, the Fourth Circuit held that the standards for obtaining a *Franks* hearing based on allegations of material omissions are very stringent, and rejected a legal standard in which "the *Franks* intent prerequisite would be satisfied in almost every case" merely because an agent made a decision not to include a particular fact in an affidavit. *Colkley*, 899 F.2d at 300. Not every omission of fact adds up to deliberate falsehood or reckless disregard for the truth. The court explained:

> *Franks* clearly requires defendants to allege more than "intentional" omission in this weak sense. "The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit." *Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate . . . .  To obtain a *Franks* hearing the defendant must show that the omission is the product of a "deliberate falsehood or of reckless disregard for the truth." "[M]ere[] negligen[ce] in . . . recording the facts relevant to a probable-cause determination is not enough."

*Id.* at 301 (citations omitted and emphasis in original).

Here, Harris has failed to make a preliminary showing that Agent Stull omitted the information regarding Agent Pruitt from the affidavits with the intent to mislead, or in reckless disregard of whether the omissions would mislead, the magistrate judge. Harris has proffered no evidence – nor can he – suggesting that Agent Stull knew at the time that the affidavits were sworn that Agent Pruitt did not recall smelling marijuana in the garage and that he had manipulated the flap on one of the boxes. In fact, the record documenting Agent Pruitt's

18

recollections and actions, and upon which Harris relies, is a discovery transmittal letter dated July 2, 2013, sent months after the search warrants were obtained.  *See* Harris Mot. to Suppress, ECF 64 at 12; *id.* Ex. M.  Harris also ignores the fact that Agent Stull was not present when Sims was escorted to the Wyndham Residence or when Agent Pruitt was in the garage.  In short, Harris fails to show, or even allege, that Agent Stull omitted these facts with the intent to make, or in reckless disregard of whether they made, the search warrant affidavit misleading.

C.    **Even If The Affiant Intentionally Or Recklessly Included Materially False Statement And Excluded Material Information, Probable Cause Still Remains.**

Even if Harris were able to make a substantial preliminary showing that the affiant intentionally or recklessly included materially false statements or excluded material information, Harris cannot satisfy his burden on the second prong under *Franks* that the false information was essential to the probable cause determination or that inclusion of the material omission would defeat probable cause.  In short, even if (i) information that Sims requested that she be transported to the Wyndham Residence to retrieve her medication and child's clothing, and consented to law enforcement's entry into the residence were excised from the affidavit; or (ii) information that Agent Pruitt did "not recall smelling marijuana in the garage" and had "manipulated the flap on one of the boxes in the garage" were included in the affidavit; (iii) or both, probable cause would still exist because there was ample nexus between the alleged criminal conduct and the Wyndham Residence.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."  U.S. Const. Amend. IV.  The probable cause standard involves "a

19

practical, common-sense decision" by the issuing judge as to whether the circumstances set forth in the affidavit establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *See Gates*, 462 U.S. at 238.  Rather than being "defined by bright lines and rigid boundaries," the standard requires simply that the facts "warrant a man of reasonable caution to believe that evidence of a crime will be found."  United States v. *Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (quotation marks omitted).  The law "does not demand showing that such a belief be correct or more likely true than false."  *Id*.

To establish probable cause that evidence of a crime is located in a particular place, an affidavit must establish a connection between the evidence of a crime and the place to be searched.  It is axiomatic that the affidavit need not contain *direct evidence* that evidence will be found in the location to be searched.  Rather, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep the evidence."  *See United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (discussing circuit split and joining majority of circuits); *see also United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005) (finding that "our cases indicate that a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence") (citation and quotation marks omitted).  Because "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," the Supreme Court has "concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination."  *Leon*, 468 U.S. at

914; *see also Williams*, 974 F.2d at 481 ("Great deference is to be given a magistrate's assessment of the facts when making a determination of probable cause.").

Relying on the well-established principle that an issuing court may rely on normal inferences of where evidence might be kept, the Fourth Circuit and other courts have upheld warrants to search a subject's residence for evidence of a crime without direct evidence of a connection between the two. For example, in the context of a search of a drug dealer's residence, the Fourth Circuit has admonished that "[w]e have consistently determined that there was probable cause to support search warrants . . . to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (reversing district court's order suppressing evidence seized from drug dealers' residences). In *United States v. Grossman*, the Fourth Circuit applied this principle in rejecting a challenge to search warrants for a drug dealer's residences without direct evidence of a connection between the residences and the drug dealing. 400 F.3d at 216-17. In *Grossman*, the defendant argued that search warrants were invalid because the affidavit did not establish a nexus between the suspected drug dealing and the residences to be searched. *Id.* Although the affidavit did not establish any direct connection between the defendant's drug dealing and the residences, the Fourth Circuit again upheld the probable cause finding by the issuing judicial officer. *Id*. at 217-18. Reasoning that the case law requires no direct connection between the criminal activity (drug dealing) and the place to be searched (three residences), the court concluded that "[u]nder

21

the circumstances, it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *Id*. at 218.

In this case, it would have been entirely reasonable for Judge Connelly to conclude that Harris and Sims stored evidence, fruits or instrumentalities of drug trafficking at the Wyndham Residence even without the alleged falsehoods or with the alleged material omissions in the affidavit. The search warrant affidavit outlined substantial evidence that Harris and Sims were involved in drug trafficking, *see* Ex. 4 at ¶¶ 5-15, stated that Harris and Sims resided at the Wyndham Residence, *id.* ¶ 11, and set forth the affiant's experience and training regarding locations where drug dealers secret evidence, *id.* ¶ 15. Indeed, people often keep their trade tools at home – medical bags for doctors; legal texts for lawyers; and assorted tools for an automobile mechanic. Similarly, drug dealers are likely to keep within their homes drugs, paraphernalia, currency, guns, ammunition and records related to the purchase, transportation, sale and distribution of controlled substances. *See Grossman*, 400 F.3d at 218. In this case, the "normal inferences" of where one would likely keep evidence of drug trafficking supported a search of the Wyndham Residence. *See Anderson*, 851 F.2d at 729.

Accordingly, even if the alleged falsehoods were excised from the affidavit, or if the alleged material omissions were included in the affidavit, or both, there would still be ample probable cause to support the search warrant of the Wyndham Residence.

### III.   The Defendants' Motions To Suppress Evidence Obtained From Searches Incident To Arrests (ECF 25, 28).

Defendant Harris's and Sims's motions to suppress unidentified evidence obtained at the time of their arrests should be denied because there was ample probable cause for their lawful arrests. "The doctrine that a search without warrant may be lawfully conducted if incident to a

lawful arrest has long been recognized as consistent with the Fourth Amendment's protection against unreasonable searches and seizures." *Ker v. California*, 374 U.S. 23, 41 (1963).  A police officer may lawfully arrest an individual if the "officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  Probable cause to justify an arrest "'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Williams*, 10 F.3d 1070, 1073-74 (4th Cir. 1993) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

In the instant case, law enforcement agents had ample probable cause to arrest Harris and Sims on April 18, 2013 after the controlled delivery.  Sims accepted and signed for the Target Pallets containing the marijuana.  In addition, when the pallets were being delivered, Harris was in the Sonata watching the undercover driver unload the pallets and both he and Sims were on their cell phones.  Furthermore, earlier the same day, law enforcement agents observed Sims and Harris together in the Sonata.  Finally, when law enforcement attempted to stop Harris in the Sonata, he engaged in a short-high speed pursuit before being apprehended.  Because there was probable cause to arrest Harris and Sims, any evidence obtained from searches incident to their arrests should not be suppressed.

## IV.  Defendant Sims's Motion To Suppress Statements (ECF 28).

In a barebones motion, Sims moves to suppress statements she made at the time of her arrest because they allegedly were obtained (i) as the result of "an illegal arrest and search and seizure" in violation of the Fourth Amendment; (ii) in violation of due process of law guaranteed

by the Fifth Amendment; (iii) in violation of her right against self-incrimination guaranteed by the Fifth Amendment; and (iv) in violation of her right to counsel guaranteed by the Sixth Amendment.   *See* Sims Mot. to Supress, ECF 28 at 1.   Her statements are not subject to suppression.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself."   U.S. Const., Amendment V.   In *Miranda v. Arizona*, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation.   384 U.S. 436, 467-74, 478-79 (1966); *Dickerson v. United States*, 530 U.S. 428, 435 (2000).   Specifically, in *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning.   384 U.S. at 478-79.

*Miranda* and its progeny do not require that police officers provide highly particularized warnings since "[s]uch a requirement would pose an onerous burden on police officers to accurately list all circumstances in which Miranda rights might apply."   *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996).   All that is required is for the police officers to "convey the general rights enumerated in *Miranda*." *Id.*

A statement will be considered "involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause."   *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).   For a statement to be deemed involuntary under the Due Process

Clause, it must be obtained by (i) threats or violence; (ii) direct or implied promises; or (iii) the exertion of improper influence. *Id.* The voluntariness of a statement is to be determined from the "totality of all the surrounding circumstances," including the characteristics of the defendant, the setting of the interview and the details of the interrogation. *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980). The test of voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *see also United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998). Voluntariness is not, however, "equated to the absolute absence of intimidation," since such a test would render virtually all statements involuntary. *Wertz*, 625 F.2d at 1134. In making this determination, "coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780.

On April 18, 2013, after she was arrested, Sims was advised of her *Miranda* rights and agreed to waive them. She signed a form acknowledging and waiving her rights. *See* Ex. 8. Sims then made voluntary statements to law enforcement. In her motion to suppress, Sims does not allege that the *Miranda* warnings and waiver were deficient. Nor does Sims explain how her statements were allegedly involuntary under the Due Process Clause. In fact, Sims does not even identify the statements she now seeks to suppress. Sims's motion has no merit and therefore should be denied.

**V.**      <u>**Sims's Motion To Adopt And Join In Motions Of Codefendants (ECF 27).**</u>

Defendant Sims has also filed a motion to adopt relevant motions filed by her co-defendants, but has failed to identify which specific motions she wishes to adopt. *See* Sims Mot. to Adopt, ECF 27. It is respectfully requested that co-defendants adopting motions be required to identify the motions that they seek to adopt and to particularize the basis for their adopting those motions to the extent that they are relying on grounds, facts or authorities other than those set forth in the adopted motions. Indeed, without this information, the government is left in the position of having to guess about the issues to which it should respond and about what evidence will need to be presented at the motions hearing. Moreover, it should be noted that the government does not consent to the adoption of any motions by defendants who lack standing to make such motions.

<u>**CONCLUSION**</u>

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' pretrial motions.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:      _____/s/_____
Nicolas A. Mitchell
Bryan E. Foreman
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_____/s/_____
Nicolas A. Mitchell
Assistant United States Attorney
