**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PWG 13-0202** |
| | * | |
| **LEONALDO HARRIS and** | * | |
| **JENNIFER SIMS,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

*******

**RESPONSE OF THE UNITED STATES OF AMERICA TO DEFENDANT**
**HARRIS'S MOTION TO REOPEN THE RECORD AND HEARING**

The United States of America, by and through its undersigned counsel, hereby respectfully submits the following response to Defendant Leonaldo Harris's Motion to Reopen the Record and the Hearing for the Purpose of Considering Additional Material Evidence and To Reconsider the Court's Prior Decision on The Motion to Suppress Evidence (the "Motion" or "Mot."). ECF 122. For all the reasons set forth in this response, the government respectfully requests that the Court deny the Motion.

## FACTS

The pretrial record in this case is voluminous. On June 7, 2013, Defendant Harris, through prior counsel, filed an initial Motion to Suppress Evidence Secured by Search and Seizure. ECF 25. On November 4, 2013, the Defendant's current counsel, Kenneth Ravenell and Milin Chun, filed a second Motion to Suppress and Incorporated Memorandum of Law, along with 14 exhibits. ECF 64. In the motion, in relevant part, the Defendant argued that evidence seized from a pallet pursuant to a "warrantless search" conducted by Tommy Arrowood, a YRC Freight ("YRC") Weights and Inspection Coordinator ("W&I Coordinator"),

should be suppressed.[1]  *See id.* at 9.  The Government filed its response on December 2, 2013, stating that the Defendant had failed to meet his burden that YRC was acting as an agent or instrumentality of the government when it conducted the routine inspection of the pallet.  ECF 67 at 10-11.  Two weeks later, Defendant Harris filed a reply along with three exhibits.  ECF 68.  In his reply, the Defendant argued that a "fact-intensive inquiry" was required to determine whether an agency relationship existed between YRC and the government, *id.* at 2-5, and noted that YRC voluntarily participated in the Customs Trade Partnership Against Terrorism ("C-TPAT"), *id.* at 4.

The Court scheduled a motions hearing for January 13, 2014.  ECF 70.  On the eve of the hearing, counsel for Defendant Harris requested a continuance on the basis that YRC had not fully complied with subpoena requests.  See Ex. A.  Attached to defense counsel's letter was the affidavit of Barry Brandman, the defendant's expert in C-TPAT and supply chain security, along with his curriculum vitae.  *Id.*  The Court denied the continuance.  *See* Ex. D, Hearing Tr. 5-6, Jan. 13, 2014.[2]  At the hearing, the Defendant called Tommy Arrowood (YRC W&I Coordinator) and Clifford Shaw (YRC Corporate Security Manger) to testify.  After hearing argument from counsel and considering exhibits introduced during the hearing, the Court held that based on the evidentiary record then before it, Defendant Harris had not met his burden of showing that YRC acted as an agent or instrumentality of the government.  *Id.* at 190-270 (ECF

---

[1]      The Defendant also requested a *Franks* hearing in connection with a search warrant for the Defendant's residence.  ECF 64.

[2]      The relevant portions of the transcripts cited herein are available at Exhibits D-I, attached hereto.  The full transcripts are available at the following docket entries: Jan. 13, 2014 Hearing Transcript (ECF 80); Apr. 14, 2014 Hearing Transcript (ECF 106); Apr. 25, 2014 Hearing Transcript (ECF 117); Apr. 29, 2014 Hearing Transcript (ECF 125); Apr. 30, 2014 Hearing Transcript (ECF 126); and May 15, 2014 Hearing Transcript (ECF 120 (excerpt)).

80).  However, since YRC had not fully complied with the subpoena requests, the Court invited Defendant Harris to provide supplemental briefing on the issue of whether the initial inspection constituted a government search due to YRC's participation in C-TPAT.  *Id.* at 268:15-21.

After receiving two extensions of time, ECF 76 & 81, Defendant Harris filed a Post-Hearing Supplemental Brief along with twenty-one exhibits on March 14, 2014.  ECF 86.   In the supplemental brief, the Defendant applied the two "primary factors" considered by the Fourth Circuit when scrutinizing a search conducted by a private party, and argued that (1) the Government "knew of and acquiesced in Mr. Arrowood's warrantless search," *id.* at 6-16, and (2) Mr. Arrowood "intended to assist law enforcement," *id.* at 17-21.  On March 31, 2014, the Government filed its response.  ECF 100.

The Court held an evidentiary hearing on the agency issue on April 14, 2014, a week before the scheduled trial date.  ECF 103.   The Defendant called to testify Steven Krupinsky (C-TPAT Chief of International Branch), Karl Cruse (C-TPAT Supply Chain Security Specialist, assigned to YRC) and Patricia Scott (YRC Border Management Services Analyst II and C-TPAT point of contact for YRC).  The Defendant generated a full day of testimony and notified the Court that he wished to call additional witnesses.  The Court postponed the trial and continued the motions hearing.  ECF 107.

The motions hearing continued over the course of four more days: April 25, April 29, April 30 and May 15, 2014.  ECF 108-111.  The Court received testimony from Barry Brandman (the Defendant's expert in C-TPAT and supply chain security), Robert Wood (YRC Dock Supervisor in North Carolina), Scott Fidler (Pennsylvania State Trooper), Tommy Arrowood (for

a second time), Michelle Gage (YRC Credit Risk Manager) and James Stull (HSI Special Agent).

On May 15, 2014, the Court heard argument from counsel and, from the bench, made findings of fact and conclusions of law. *See generally* Hearing Tr., May 15, 2014 (ECF 120 (excerpt)). The Court denied the Defendant's motion to suppress. *See id.* The Court held that "what was done by C-TPAT did not constitute mandated searching," that "it didn't require anything other than identification and reporting," and that "it did not constitute a search of the government." Ex. I, Hearing Tr. 47:16-21, May 15, 2014; *see also id.* at 39:4-40:1 (noting that YRC, as part of its ordinary business practice, had an independent motivation to inspect cargo, and that if YRC decided to contact U.S. Customs and Border Protection ("CBP") regarding suspicious activity, "at best that would be passive acceptance or acquiescence in private search efforts"). With regard to the issue of Mr. Arrowood's intent when he conducted the initial inspection, the Court stated that it could "only begin to speculate what was going on in Mr. Arrowood's mind," but explained that "what I can't find is that there is evidence that Arrowood was acting [at the time of the initial inspection] like he is now acting for Pennsylvania State Police . . . ." *Id.* at 41:2-19. On May 16, 2014, the Court signed a one-page order denying the motion to suppress for the reasons stated on the record on January 14 and May 15, 2014. ECF 116 (docketed on May 19, 2014).

More than five weeks later, on June 20, 2014, Defendant Harris filed the instant Motion, along with five exhibits, requesting that the Court reopen the record and the hearing, and reconsider its denial of the motion to suppress. *See generally* Mot. The Defendant argues that the Court should revisit its ruling because (1) "new evidence, which is not publicly available,

became relevant based on the Court's decision, and is material to the outcome of the suppression hearing," *see id.* at 9-18; and (2) the Defendant met his burden of proving by a preponderance of the evidence that Mr. Arrowood was motivated by a desire to assist law enforcement or that his actions and those of YRC are fairly attributable to the Government, *id.* at 19-25.

## ARGUMENT

## I.  The Defendant's Motion Is Too Little, Too Late.

Whether construed as a motion to reopen the record or for reconsideration, the Defendant's Motion is unwarranted.

### A.  The Defendant Has Failed To Justify Reopening the Record.

District courts reopen records only in limited circumstances.   In *United States v. White*, 455 F. App'x 647 (6th Cir. 2012), a case cited by Defendant Harris in his Motion, the Sixth Circuit stated that there are several factors a district court should consider when determining whether or not to grant such a motion:

> First, the party seeking to reopen must provide a reasonable explanation for failing to present the evidence initially. Then the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing should be considered.

*Id.* at 650-51 (internal citations omitted).  Similarly, the Fourth Circuit has explained that:

> when the evidence forming the basis for a party's motion for reconsideration was in the movant's possession at the time of the initial hearing, . . . the movant must provide a legitimate reason for failing to introduce that evidence prior to the district court's ruling on the motion to suppress before we will determine that a district court abused its discretion in refusing to reconsider its suppression ruling.

*United States v. Dickerson*, 166 F.3d 667, 679 (4th Cir. 1999), *rev'd on other grounds*, 530 U.S. 428 (2000) (internal citations omitted)[3]; *see also United States v. Carter*, 374 F.3d 399, 405-06 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1111 (2005) ("[t]he party moving to reopen should provide a reasonable explanation for failure to present the evidence [initially]."). "[C]ourts should be extremely reluctant to grant reopenings." *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (citation omitted).

The Defendant argues that the Court should reopen the record based on "new evidence, which is not publicly available" and that "became relevant based on the Court's decision." Mot. at 9. The "new evidence" cited by the Defendant is a PowerPoint presentation purportedly distributed at a C-TPAT conference in the spring of 2007. *Id.* at 11; *id.* at Ex. C (hereinafter ECF 122-3). The PowerPoint presentation is entitled "Supply Chain Security in a Post 9/11 Environment," and the second slide reads "Air Container Search Procedures" (the "Air Container PowerPoint"). ECF 122-3 at 2. The Defendant argues that the Air Container PowerPoint became relevant "[o]nly after the Court's opinion," because it was then made "apparent that the Court was requiring language explicitly instructing or encouraging C-TPAT members to *open and/or search* cargo." Mot. at 11 (emphasis in original). The Defendant's expert, Mr. Brandman, retrieved the Air Container PowerPoint from his "old files" after the Court's May 15, 2014 ruling. *Id.* Ex. B ¶¶ 5-6; Mot. at 10. The Defendant states that the Air Container PowerPoint was "previously not introduced because it is not available on CBP's public website." Mot. at 10.

---

[3]     The Fourth Circuit has continued to cite *Dickerson* even though it was reversed on other grounds. *See, e.g.*, *United States v. McCoy*, 348 F. App'x 900, 902 (4th Cir. 2009).

As an initial matter, the issue of whether C-TPAT encouraged its members to open and search cargo for the purpose of finding contraband was raised long before the Court's ruling on May 15, 2014.  For example, in Mr. Ravenell's January 12, 2014 letter to the Court requesting a continuance, defense counsel stated that he had served subpoenas on YRC seeking, in relevant part:

- Any and all cooperation agreements or understandings YRC has pursuant to the Customs-Trade Partnership Against Terrorism Agreement (C-TPAT) from 2009 to April 2013.

- Any and all cooperation agreements or understandings YRC had or has with local and federal law enforcement, whether formal or informal, to conduct searches or inspections in order to deter smugglers of illegal contraband from using YRC's employees, equipment or services to transport contraband from 2009 to April 2013.

- Any correspondence between YRC and United States Customs Department, or federal law enforcement and/or local law enforcement agencies regarding YRC's searches or inspections in order to deter smugglers from using YRC's employees, equipment or services to transport contraband from 2009 to April 2013.

- Any YRC guidelines addressing the guidelines or policy for YRC inspectors to conduct inspections or searches for contraband from 2009 to April 2013.

Ex. A.  The following day, at the initial hearing on January 13, 2014, the Government noted during oral argument that the Defendant had not "provided any sort of evidence suggesting that under C-TPAT, the government directs, requests or required YRC to do any inspections of shipments for illegal narcotics or contraband."  Ex. D, Hearing Tr. 219:17-20, Jan. 13, 2014. During subsequent hearings, the government repeatedly asked witnesses whether certain C-TPAT documents set forth procedures regarding the opening and searching of freight.  *See, e.g.*, Ex. E, Hearing Tr. 97:3-13, Apr. 14, 2014 (Krupinsky); *id.* at 188:9-189:2, 193:18-195:9 (Cruse); *id.* at 242:8-244:15 (Scott); Ex. F, Hearing Tr. 116:5-21, 117:19-119:8, Apr. 25, 2014 (Brandman).  Conversely, defense counsel repeatedly asked witnesses whether they were aware

of any materials in which C-TPAT told its members not to open freight that might contain drugs. *See, e.g.*, Ex. E, Hearing Tr. 120:8-16, Apr. 14, 2014 (Krupinsky); *id.* at 204:15-205:23 (Cruse); *id.* at 252:1-15 (Scott); Ex. F, Hearing Tr. 79:21-80:6, Apr. 25, 2014 (Brandman); *see also id.* at 75:4-7 (noting that "the witnesses who testified last week repeatedly testified that members are not required . . . to inspect and open packages").  Even the Court asked Mr. Brandman whether any of the C-TPAT documents in the record recommend that members do anything other than notify C-TPAT or law enforcement upon discovery of a suspicious shipment, whether he had ever participated in a session in which C-TPAT provided training on how to open a shipment and whether C-TPAT tells companies that their membership will be in jeopardy if they fail to open a suspicious shipment.  *See* Ex. F, Hearing Tr. 76:24-77:21, 78:8-11, Apr. 25, 2014 (answering all questions in the negative).  And when the Court completed this inquiry, defense counsel stated "[t]hat was the next line of questioning I was going into, but I was going to take another angle." *Id.* at 79:2-4.  The Defendant has long been on notice of this issue and therefore cannot now describe the Air Container PowerPoint as becoming relevant only after the Court's ruling.

The Defendant's explanation that he did not previously introduce the Air Container PowerPoint "because it was not on CBP's website" is undercut by the fact that the presentation was previously available to the Defendant both in Mr. Brandman's "old files" as well as through C-TPAT's web portal.[4]  Mot. at 10.  Indeed, Mr. Brandman avers that after the May 15, 2014

---

[4]     In his Motion, the Defendant states that "[w]hen the defense had previously sought information from C-TPAT, the CBP objected to the subpoena . . . ."  Mot. at 10 n.6.  The Defendant thereby appears to imply that he issued a subpoena on C-TPAT for records that would include the Air Container PowerPoint.  In fact, on February 19, 2014, the Defendant issued two subpoenas *duces tecum* on C-TPAT employees Karl Cruse and Thomas Falanga, requesting communications between YRC and C-TPAT or CBP regarding the discovery of marijuana (1) at YRC's Carlisle, Pennsylvania terminal on April 17, 2013 and (2) by Bob Wood at YRC's

hearing, he received a request from defense counsel to search for additional evidence, and pursuant to that request, he found the Air Container PowerPoint.  Mot. Ex. B ¶¶ 5-6; *see also* Mot. at 10 (stating that Mr. Brandman located the presentation in "his old files").  Mr. Brandman further avers that the Air Container PowerPoint was also available on the C-TPAT web portal.  Mot. Ex. B ¶ 6.  The Defendant does not allege that Mr. Brandman first received the Air Container PowerPoint after the May 15, 2014 hearing or that the presentation was made available on the C-TPAT web portal only after the hearing.  Indeed, the Air Container PowerPoint is related to a C-TPAT conference that took place in the ***spring of 2007***.  The presentation simply does not fall into that narrow category of evidence consisting of documents that were previously unavailable to defense counsel.

The Defendant has failed to provide a legitimate explanation for failing to submit the evidence initially.  See *Dickerson*, 166 F.3d at 679.  The Defendant was provided ample opportunity to develop an exhaustive record by examining ten witnesses (two of whom were sponsored by the government) over the course of six days of evidentiary hearings, by submitting thousands of pages of exhibits and by filing numerous briefs.  Nothing prevented the Defendant from providing the Air Container PowerPoint to the Court and from calling witnesses to question them about the presentation before May 15, 2014.  Instead, the Defendant provided the presentation five weeks after the Court issued its decision and almost eight months after he filed his November 4, 2013 motion to suppress.  The Defendant's last ditch effort should not be countenanced and the already exhaustive record should remain closed.

---

Raleigh, North Carolina terminal.  *See* Exs. B & C.  Accordingly, even if C-TPAT had produced documents in response to the subpoenas, the Air Container PowerPoint would not have been responsive.  Furthermore, the Defendant did not move to compel the production of any records from C-TPAT or CBP.

**B.**     **The Defendant's Motion For Reconsideration Is Untimely.**

The Defendant's Motion is untimely under the Local Rules of this Court. Local Rule 105.10, which applies to criminal proceedings pursuant to Local Rule 207, states that "any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order." L.R. 105.10. Defendant Harris filed the instant Motion on June 20, 2014 – more than five weeks after the May 15, 2014 hearing and associated order denying the motion to suppress. The Defendant's motion is untimely under the Local Rules, and therefore should be denied.

**II.**     **Even If The Record Is Reopened, The Defendant's "New" Evidence Does Not Establish That YRC Acted As An Agent Or Instrumentality Of The Government.**

Even if the record is now reopened, when considered together with the other evidence in this case, the Defendant's "new" evidence of the Air Container PowerPoint is insufficient to establish that the government, by virtue of C-TPAT, knew of and acquiesced in YRC's search of the pallet on April 17, 2013 or that YRC intended to assist law enforcement.[5] The Air Container PowerPoint does not apply to cargo transported by highway carriers, such as the pallet at issue in this case. Nor is there any evidence that YRC or Mr. Arrowood were aware of and implemented the information within the Air Container PowerPoint.

---

[5]     For the first time, the Defendant suggests that the two primary factors used to determine whether a private search raises Fourth Amendment issues, articulated in *United States v. Jarrett*, 338 F.3d 339 (4th Cir. 2003) and *United States v. Ellyson*, 326 F.3d 522 (4th Cir. 2003), is the "incorrect test." Mot. at 7-9. However, the Defendant repeatedly and consistently cited and applied these factors in its various briefs and during oral argument. *See, e.g.*, ECF 68 at 3; ECF 86 at 3; Ex. D, Hearing Tr. 195:14-205:16, Jan. 13, 2014. The Court correctly applied binding Fourth Circuit precedent when analyzing whether YRC and Mr. Arrowood acted as an agent or instrumentality of the Government.

**A.      The Air Container PowerPoint Is Irrelevant To Cargo Transported By Highway Carrier.**

On its face, the Air Container PowerPoint does not apply to cargo transported by highway carriers.

The Air Container PowerPoint is entitled "Air Container Search Procedures" and discusses several types of containers used to transport cargo by airplane.  ECF 122-3 at 2.   The presentation refers to the "standard" LD-3 air cargo container found "all around the world," and which is typically made of aluminum with a canvas door.  *Id.* at 5; *see also id.* at 6-18 (describing how contraband can be hidden within the skeletal structure of the air container); *id.* at 29-36 (stating that smugglers sometimes use a false roof on aluminum containers to hide contraband); *id.* at 51-53 (observing that the aluminum beams on the canvas doors can be used to secrete contraband).  The Air Container PowerPoint also references metal shipping pallets, which are sheets of metal welded or riveted together to form a platform.  *Id.* at 19-25 (showing how contraband can be secreted between the two flat sheets of metal); *see also id.* at 26-28 (stating that cargo nets can be used to secrete contraband).   In addition, the presentation discusses wooden pallets whose supports may contain contraband.  *Id.* at 37-42 (demonstrating how contraband can be hidden within hollowed wooden blocks).   Finally, the Air Container PowerPoint touches upon crates, which are not the "standard shipping container" for air cargo. *Id.* at 43-50 (showing false bottoms).

The Air Container PowerPoint is not relevant to YRC.  YRC is a national less than truckload ("LTL") highway carrier.  *See* Ex. H, Hearing Tr. 7:13-8:25, Apr. 30, 2014.  YRC uses trucks to ship freight within the United States; it is not an air cargo shipping company.  Indeed,

YRC transported the pallet at issue in this case by truck from California to Pennsylvania.   The

pallet was not an "air container" under any definition of the term.[6]

The Defendant nonetheless argues that the Air Container PowerPoint should be used to

decipher and interpret the terms "inspect" and "detect" used in other C-TPAT materials.  Mot. at

13-16.  The Defendant argues that because the Air Container PowerPoint refers to the "use of

NOI (non intrusive [sic] inspection) equipment such as a pallet x-ray machine or the Buster,"

ECF 122-3 at 6, when C-TPAT in other materials uses the term "inspect," it is necessarily

referring to intrusive inspections as opposed to non-intrusive inspections. Mot. at 14-15.  To the

contrary, the Air Container PowerPoint shows that C-TPAT knows how to describe, with

specificity, different techniques for detection of contraband when it wants to: "[e]xam can be as

simple as tapping on the container," ECF 122-3 at 5 (LD-3 container); "will require drilling into

the hollow space" of the support structure, *id.* at 6 (LD-3 container); "tap on all sides," *id.* at 10

(aluminum container); "push the container," *id.* (aluminum container); "[h]ere drilling was done

to reveal narcotics," *id.* at 40 (wooden pallet); "[u]se caution with your drill as some contrabands

may react differently to being pierced," *id.* (wooden pallet); "X-ray is very effective here," *id.* at

46 (crate); and "removal of the side of the crate is an option, be sure to repack the crate in a

secure manner to withstand the rigors of cargo routing," *id.* at 46 (crate).   In other literature, C-

TPAT could have – but did not – suggest, encourage, or require highway carriers to drill into, x-

---

[6]      Even if the wooden pallet at issue in this case somehow fell into the same category as the
wooden pallets described in the Air Container PowerPoint – which it does not – the presentation
does not suggest, recommend or require that freight shipping companies open and search the
cargo that is stacked on top of a wooden pallet.  The Air Container PowerPoint merely describes
how contraband can be secreted within the structure of the pallet itself, namely within hollowed
wooden blocks forming the vertical supports of the pallet.  ECF 122-3 at 37-42.

ray, remove or otherwise open and search cargo placed on top of pallets and transported within trucks.[7]

In sum, the Air Container PowerPoint has no bearing on whether YRC, a LTL highway carrier, acted as an agent or instrumentality of the Government when it opened and searched a freight shipment that had been transported by truck within the United States.

**B.      There Is No Evidence That YRC Or Mr. Arrowood Were Aware Of And Adopted The Air Container PowerPoint.**

Furthermore, the Defendant has provided no evidence that YRC or Mr. Arrowood were aware of the Air Container PowerPoint and implemented the information contained therein. Indeed, one would not expect YRC – a LTL highway carrier – to take note of, let alone adopt, a presentation about *air containers*.   Nor has Defendant pointed to any YRC records in which the company appears to implement the techniques described in the Air Container PowerPoint to search for contraband, such as drilling into containers.   In fact, Patricia Scott (YRC Border Management Services Analyst II and C-TPAT point of contact for YRC) testified that Karl Cruse (the C-TPAT Supply Chain Security Specialist assigned to YRC) never recommended that YRC should open and search cargo.   Ex. E, Hearing Tr. 244:24-245:4, Apr. 14, 2014.   Mr. Cruse similarly testified that he never had any discussions with YRC regarding the company's drug awareness training program.   *Id.* at 164:15-23; *see also id.* 166:7-12 ("It's pretty much you do a validation and you're done for four years."); 167:9-15 (stating that he does not have "regular conversations" with YRC).

---

[7]      Moreover, if the Air Container PowerPoint were a cipher through which all other C-TPAT documents should be decrypted, as suggested by the Defendant, then one would have expected, due to the presentation's alleged importance, that defense counsel or a witnesses would have brought it to the Court's attention sooner.

Accordingly, even if the Court were to reopen the record and consider the Air Container PowerPoint, the Defendant still has not met his burden of proving that YRC acted as an agent or instrumentality of the Government.

**III.    The Defendant Has Proffered No New Evidence Justifying Reconsideration Of Mr. Arrowood's Testimony, And The Court Applied The Correct Standard Of Proof.**

Defendant Harris, without proffering any new evidence, argues that the Court should reconsider its findings with regard to Mr. Arrowood. The Defendant argues that the Court "held Mr. Harris to an incorrect and almost impossible standard of proof – convincing this Court to know 'for sure' a person's intent." Mot. at 19; *id.* at 21 ("[T]he Court held Mr. Harris to a stricter standard than preponderance of the evidence."). The Defendant's argument has no merit.

It is a defendant's burden to prove an agency relationship by a preponderance of the evidence. *See United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987); *United States v. David*, 943 F. Supp. 1403, 1409 (E.D. Va. 1996); *see also United States v. Richardson*, 607 F.3d 357, 364 (4th Cir. 2010) ("The defendant shoulders the burden . . . ."). To establish a fact by a preponderance of the evidence, the party with the burden of proof must establish that the fact is "more likely than not." *See, e.g.*, *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012).

At the May 15, 2014 hearing, the Court stated that it could "only begin to speculate what was going on in Mr. Arrowood's mind." Ex. I, Hearing Tr. 41:2-3, May 15, 2014. The Court highlighted issues raised by Mr. Arrowood's testimony and repeatedly found that those issues could not be resolved based on the evidence before it. *Id.* at 41:1-16. The Court ultimately concluded that "what I can't find is that there is evidence that Arrowood was acting [at the time of the initial inspection] like he is now acting for Pennsylvania State Police . . . ." *Id.* at 41:17-19.

14

The Court carefully considered Mr. Arrowood's testimony, along with the testimony of other witnesses.   For the reasons stated in the record, the Court correctly found that the Defendant had failed to meet his burden of proving that it was more likely than not that Mr. Arrowood intended to assist law enforcement when he conducted the routine inspection of the pallet on April 17, 2013.[8]  *See id.* at 41:17-19.  Having provided no legitimate basis for the Court to reconsider its findings regarding Mr. Arrowood, the Defendant's Motion should be denied.

---

[8]       In his Motion, Defendant Harris enumerates six alleged "lies" told by Mr. Arrowood when he testified in connection with this case.  Mot. at 21-23.  The Government disagrees with the Defendant's characterizations of Mr. Arrowood's testimony and descriptions of alleged contradictory evidence.  *Compare, e.g.*, Mot. at 22 ¶ 1 (falsely stating that the Government made an "admission"  that "Mr. Arrowood *only* allegedly told the Government that the reason he opened the pallet was because the weigh bill described the contents as rims and at least one of the boxes in the pallet described the contents as wheels" (emphasis added)), *with* Ex. D, Hearing Tr. 117:18-118:4, Jan. 13, 2014 (reflecting that the Government confirmed that the information regarding wheels and rims "was provided by Mr. Arrowood, as well as [by] some of the documents that were provided in discovery," but making no representations that this was the *only* information provided to the Government by Mr. Arrowood).

        In addition, although ignored by Defendant Harris, much of Mr. Arrowood's testimony is consistent with testimony of other witnesses.  For example, Mr. Arrowood testified that as a W&I Coordinator, he was not familiar with YRC's Security General Plan, Ex. G, Hearing Tr. 145:23-146:4, Apr. 29, 2014, that he was not trained to look for the suspicious indicators identified in YRC's Security General Plan, *id.* at 151:22-152:14, 157:10-12, that the indicators do not pertain to what he does, *id.* at 154:24-25, and that when he performed the routine inspection of the pallet on April 17, 2013, he did not open and search the pallet based on these indicators, *id.* at 207:9-209:17.  Mirroring Mr. Arrowood's testimony, Michelle Gage, a YRC Credit Risk Manager and former corporate collections supervisor and billing supervisor, explained that YRC W&I Coordinators play a critical role in ensuring that YRC properly charges its customers for shipping freight based on commodity classifications, Ex. H, Hearing Tr. 12:9-18:16, Apr. 30, 2014, and testified that if YRC no longer had the ability to open shipments to determine the actual character of the property being shipped, it would have a significant financial impact on the company because some customers provide false commodity descriptions in order to receive lower rates, *id.* at 35:1-14.  Consistent with the role of W&I Coordinators and Mr. Arrowood's testimony, Clifford Shaw, a YRC Security Manager, testified that he did not provide any training to YRC W&I Coordinators regarding the detection of contraband.  Ex. D, Hearing Tr. 182:19-183:6, Jan. 13, 2014.  Similarly, Robert Wood, the YRC Dock Supervisor in North Carolina who found an unrelated freight shipment containing marijuana in 2007, testified that he was not familiar with YRC's security profile, Ex. G, Hearing Tr. 10:24-11:2, Apr. 29, 2014, and

**<u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully requests that the Court deny Defendant Harris's Motion.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:     _____/s/_____
Nicolas A. Mitchell
Bryan E. Foreman
Assistant United States Attorneys

---

that he had not received drug awareness training since he was first hired in 1997 by Roadway, a predecessor company of YRC, *id.* at 10:17-23.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 5, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


_____/s/_____
Nicolas A. Mitchell
Assistant United States Attorney

17